**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARIA SEPEDA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 11 C 8699** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **CAROLYN W. COLVIN[1], Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION AND ORDER

Maria Sepeda seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2). Ms. Sepeda asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.

### PROCEDURAL HISTORY

Ms. Sepeda applied for DIB on August 1, 2008, alleging that she had become disabled on May 30, 2008, due to a cervical spinal injury, numbness and weakness in her left leg, and numbness in her right arm. (Administrative Record ("R.") 133-39, ). Her application was denied initially and upon reconsideration (R. 84-91, 93-95). Ms. Sepeda filed a timely request for a hearing. An administrative law judge ("ALJ") convened a hearing at which Ms. Sepeda, represented by counsel, appeared and testified. In addition, Thomas Gusloff testified as a vocational expert. (R. 43-83). On

---

[1] Pursuant to Federal Rules of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for Michael J. Astrue as the appellee.

June 4, 2010, the ALJ issued a decision finding that Ms. Sepeda was not disabled because she could perform light work that did not involve climbing ladders, ropes, or scaffolds, or more than occasional climbing of ramps/stairs, balancing, stooping, crouching, kneeling or crawling, and was limited to simple, routine and repetitive tasks. (R. 16-34). The ALJ's decision then became the final decision of the Commissioner when the Appeals Council denied Ms. Sepeda's request for review. (R. 1-4). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Sepeda has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE OF RECORD

### A.
### The Vocational Evidence

Ms. Sepeda was born on November 26, 1966, making her forty-three years old at the time of the ALJ's decision. (R. 158). She is 5'2" tall and weighs 217 pounds. (R. 162). She has a high school education. (R. 169). She has worked a number of jobs, including packing and assembly jobs in warehouses and factories. Most recently, she has worked as a custodian at a church. (R. 164).

### B.

### The Medical Evidence

An April 14, 2008 MRI of the lumbar spine showed a tiny disc herniation with annular tear at the L5-S1 level. (R. 313). On May 15, 2008, an MRI of the thoracic spine was normal. (R. 309). The MRI of the cervical spine, however, revealed degenerative changes with disc bulging and osteophytes at C5-6 and C6-7. There was also flattening of the spinal cord at C5-6, and foraminal narrowing at C6-7 due to disc protrusion. (R. 311). On June 8, 2008, an MRI of the lumbar spine

showed a very small disc protrusion or bony osteophyte at T7-8 . (R. 306).

On June 23, 2008, it was determined that Ms. Sepeda would require a cervical discectomy and fusion at C5-6, C6-7. (R. 295-96, 318). She had upgoing toes on the right side, strength decreased to 4-/5 on the left side, and some spasticity of the neck. (R. 318). A hard cervical collar was prescribed with use after the operation. (R. 297). Post-operatively, a CT scan revealed that the stabilizing plate was separated from the vertebral body by 3 mm at C5-6, but that hardware was otherwise in a good position. (R. 299). Elsewhere, there were no more than mild degenerative changes. (R. 299).

Ms. Sepeda called her doctor on August 5, 2008, to complain of intermittent low back pain and a feeling of weakness in her left leg. She had no numbness or tingling. (R. 368). On August 13, 2008, an MRI of the lumbar spine revealed a small lesion at the L5 level and a protruding disc at the L5-S1 level, with mild indenting of the dural sac. (R. 300-301). A subsequent CT scan essentially echoed these findings. (R. 303). A thoracic spine MRI on August 23rd revealed mild degenerative changes and mild to moderate foraminal narrowing at T9-10. (R. 320).

On September 26, 2008, Dr. Richard Bilinsky reviewed the medical evidence on behalf of the disability agency. (R. 331-38). He concluded that Ms. Sepeda would be able to perform light work except for more than occasional climbing of ladders/ropes/scaffolds, stooping, or crawling. (R. 333). Her ability to constantly reach overhead was also limited. (R. 334).

On September 29, 2008, Ms. Sepeda reported left leg weakness and numbness. Sensation and strength were within normal limits. (R. 369). On October 20, 2008, Ms. Sepeda went to a pain treatment center, complaining of low back pain radiating to both legs and left leg weakness. (R. 342). The pain was 10/10. (R. 342). Examination revealed left leg strength reduced to 3/5,

diminished reflexes, and significantly decreased left lumbar range of motion. (R. 342). She was given an epidural steroid injection the next day. (R. 343).

On November 14, 2008, Ms. Sepeda underwent an EMG and nerve conduction study to rule out generalized neuropathy and lumbosacral radiculopathy. The study was essentially normal. There was no evidence of any chronic lumbosacral radiculopathy in either leg, no evidence of generalized radiculopathy, and no evidence of myopathy. (R. 357). Ms. Sepeda received another epidural steroid injection on December 1, 2008. (R. 350).

On January 20, 2009, Dr. Solfia Saulog reviewed the medical record on behalf of the disability agency and agreed with Dr. Bilinsky's findings of September 26, 2008. (R. 373). On February 23, 2009, Ms. Sepeda had a thoracic epidural steroid injection. (R. 380). On March 23, 2009, Ms. Sepeda complained of constant thoracic pain. She rated it a 10+ on a scale of 1 to 10, and said the intensity varied. (R. 378). She complained of thoracic and lower back pain with left leg weakness on May 8, 2009, rating it a 6-7 and again, saying that it varied in intensity. (R. 377). She had essentially the same complaints on July 23, 2009, but did not rate her pain's intensity. (R. 376). On June 1, 2009, Ms. Sepeda complained of moderate back pain – rating it a 6 – that, oddly, she said had began only recently. (R. 428). Glucose was again elevated at 150 (R. 433), but there were no diabetic symptoms – thirst, sweating, etc. (R. 429). Musculoskeletal exam revealed moderately reduced lumbar extension and lateral motion. Strength, tone, and stability were normal. (R. 430).

On July 16, 2009, Ms. Sepeda's back was fine – she had no complaints. (R. 440). She had no diabetic symptoms. Diabetes was non-insulin dependent and controlled. (R. 441). On September 3, 2009, Ms. Sepeda's glucose was elevated at 150. (R. 410). She again had no complaints on October 15, 2009. (R. 446-47). On November 14, 2009, glucose was normal. (R. 452). Ms. Sepeda

began to experience foot and ankle symptoms on November 18th that she described as moderate "burning, cramping, sharp, shooting." (R. 454). Musculoskeletal exam was normal – gait was smooth, range of motion was full. (R. 454). Diabetes was improved. (R. 455).

On December 11, 2009, Ms. Sepeda complained of thoracic and low back pain with some pain and tingling in both legs. She rated it an 8, but it sometimes got down to a 5. (R. 393). Exam was normal except for some tenderness in the feet. (R. 393-94). It was noted that "diabetic neuropathy is making huge part of a problem for this pt." (R. 394).

On January 8, 2010, Ms. Sepeda complained of back pain she claimed "began months ago." It radiated to the right leg and she rated it a 5 out of 10. She continued to have the foot symptoms she reported in November 2009. (R. 454). Musculoskeletal exam was normal – gait was smooth, there was no tenderness in the lower extremities and strength and range of motion was normal. (R. 455). There was moderately reduced lateral motion and flexion, however. (R. 461-62).

An MRI on February 22, 2010, showed improvement in the lumbar spine with the cystic focus near LR gone and no more than mild diffuse disc bulge at L5-S1 with no significant stenosis of the central canal or neural foramina. (R. 500). On March 5, 2010, Ms. Sepeda went in to see her doctor, who noted she was "using a cane to walk now due to chronic back pain radiating t[o] Lt leg." But musculoskeletal exam revealed no instability or tenderness, and strength and tone were normal. Lateral motion was moderately reduced. (R. 498).

On March 15, 2010, Ms. Sepeda's treating doctor referred her for an orthopedic consult. She was noted to walk with a limp and use a cane. She had a full range of motion in her neck and she was neurologically intact in her upper extremities. There was tenderness between L3 and S1. Strength in the left quadriceps was somewhat diminished at 4/5. She was otherwise neurologically

intact in terms of strength and sensation, reflexes were normal on the right but negative on the left. Babinski sign was negative. (R. 504). The doctor reviewed the most recent MRIs, noting that the thoracic study was negative; the lumbar study revealed some degenerative changes between L4 and S1, but no evidence of nerve impingement; the cervical spine show only evidence of the surgical fusion. (R. 505). Dr. Rinella said Ms. Sepeda should be as active as possible and ambulate as much as possible. She should pursue aqua therapy. She should lose weight. These were the only interventions that could predictably improve her symptoms. (R. 505).

### C.

### The Administrative Hearing Testimony

### 1.

### The Plaintiff's Testimony

At her hearing, Ms. Sepeda testified that, she left her custodial job due to neck, back, and leg pain, she had not looked for even a sit-down job because she could not sit for more than 30 minutes due to burning pain. (R. 51-52). She said she took Neurotonin for the pain, but it did not alleviate her pain at all. All it did was allow her to get about four hours of sleep at night. (R. 53). She rated her neck pain at 8 and her back pain at 10. (R. 53). She never had to go to the emergency room due to it, however. (R. 53). The ALJ asked her to rate her pain again, with 1 no pain at all, and 10 requiring a trip to the emergency room. Ms. Sepeda insisted it was 10, and explained that she had never gone to an emergency room because she had been seeing doctors. (R. 54).

The ALJ said that the record did not reveal her reporting emergency-room level pain to her doctors. Ms. Sepeda then changed her story and said she didn't go to the emergency room because half the time she didn't have a ride. She then said her pain was 10 right then from sitting and waiting

for her hearing. (R. 54-55). When the ALJ read to her from the record indicating that, for example, she reported that her back pain was only a 5 of 10 to her doctor on January 8, 2010, Ms. Sepeda was defiant:

A. Back pain was a ten.

Q. Well, why would the doctor report it as a five?

A. I don't know.

Q. Were you using a cane?

A. Yes.

Q. Because the doctor said your gait was smooth with regular rhythm and symmetrical stride length. The station and balance, and posture was normal. . . . She said your gait overall was normal.

A. I can't walk. I don't know why she would say that. I've been going to her for a long time. She's seen me, Dr. Tubic. I've been like this since 2008.

(R. 59).

Ms. Sepeda said her leg pain was a 10, and her doctor had told her it was due to diabetic neuropathy. (R. 55). She said she could walk no farther than 10 feet, with a cane. (R. 56). She could stand for no more than 10 minutes, after which she had to sit down – which, again, she could tolerate for no more than 30 minutes. (R. 56). She had to lie down afterwards. (R. 65). She could lift no more than 2 pounds. (R. 56). She was unable to do anything at home – cook, shop, laundry, vacuum, etc. (R. 57). Ms. Sepeda said all she did was:

Lay around, sit down, eat. Take a shower two or three times a week, with help. There's days I can't even take a shower. I can't get out of bed.

(R. 58). Aside from that, she went to doctor's appointments. (R. 58). She watched some television and read the Bible twice a week for a half hour. (R. 606). She went to church twice a month for an

hour when she could get out of bed.  (R. 60).

When her sugar was high, she was extremely tired and got headaches.  She was taking metformin for her diabetes since June 2009.  (R. 66).  She said she followed a diet limiting her to 45-60 carbs at each meal.  (R. 67).  She said she had gained 50 pounds since she stopped working. (R. 67).

## 2.

### The Vocational Expert's Testimony

Thomas Gusloff then testified as a vocational expert.  Assuming a person who could perform light work that did not involve climbing ladders, ropes, or scaffolds, or more than occasional climbing of ramps/stairs, balancing, stooping, crouching, kneeling or crawling, and was limited to simple, routine and repetitive tasks could perform any of Ms. Sepeda's past work.  The VE said no, but they could perform jobs like bagger (38,000 jobs), stuffer for textiles (10,000 jobs), or laundry worker/folder (2000 jobs).  (R. 78).  If such a person were limited to sedentary work with the same additional restrictions, they could still do jobs like fishing reel assembler (4000 jobs), stuffer for toys (2500 jobs), or food and beverage order clerk (6950 jobs).  (R. 79).  Predictably, when questioned by Ms. Sepeda's attorney, the VE said that a person who had to be on break more often than they worked could not maintain employment.  The same went for someone who had to lie down after sitting for just 30 minutes.  (R. 82).

## D.

### The ALJ's Decision

The ALJ found that Ms. Sepeda suffered from the following severe impairments: status post cervical fusion, diabetes, and obesity.  (R. 21).  The ALJ next determined that she did not have an

impairment or combination of impairments that met or equaled a listed impairment, specifically considering the listings for disorder of the spine, major dysfunction of a joint, peripheral arterial disease, and diabetes. He considered the effects of Ms. Sepeda's obesity as well. (R. 21-23)(She weighs 217 lbs.).

The ALJ went on to determine that Ms. Sepeda retained the capacity to perform light work. that did not involve climbing ladders, ropes, or scaffolds, or more than occasional climbing of ramps/stairs, balancing, stooping, crouching, kneeling or crawling, and was limited to simple, routine and repetitive tasks. (R. 23). The ALJ determined that Ms. Sepeda's "medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 26). The ALJ explained that Ms. Sepeda's allegations conflicted with the medical evidence, her behavior at the hearing, and her statement as to her activities. (R. 26-28). The ALJ accorded "some weight" to the opinions of reviewing medical consultants who found Ms. Sepeda capable of light work with some postural limitations. (R. 28). The ALJ then relied upon the testimony of the vocational expert that, given a capacity for light work with the given postural and simple work limitations, a person could perform jobs like bagger/hand packager, textile industry stuffer, or folder/ laundry worker. Even if the exertional capacity were reduced to the sedentary work level, the person could still perform jobs like fishing reel assembler, toys stuffer, or food/beverage order clerk. (R. 29). As these jobs exist in significant numbers in the regional economy, the ALJ concluded that Ms. Sepeda was not disabled and, therefore, not entitled to disability insurance benefits. (R. 29-30).

# IV.

## DISCUSSION

### A.

### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is not a difficult standard to meet; it is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the

court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALL's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). The Seventh Circuit also calls it a "lax" standard, *Berger*, 516 F.3d at 544.

**B.**

**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

> 1) is the plaintiff currently unemployed;
>
> 2) does the plaintiff have a severe impairment;
>
> 3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
>
> 4) is the plaintiff unable to perform his past relevant work; and
>
> 5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof

through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

### C.

### Analysis

Ms. Sepeda submits that the ALJ's decision must be remanded because his credibility determination was erroneous, and because his residual functional capacity determination ("RFC") was erroneous. We begin with credibility because, as here, these cases so often turn on credibility. Ms. Sepeda claims that she is in emergency-room level pain – 10 on a scale of 10 – all the time! She can walk no more than 10 feet, sit for no more than 30 minutes and stand for no more than 10. She has to lie down almost all the time. She is incapable of doing just about anything at her home. Yet her doctor said she could walk fine. Her musculoskeletal exams are essentially normal. Her most recent MRI actually showed she was improving and revealed only some degenerative change. An EMG showed no evidence of radiculopathy or myopathy. Glucose levels have been elevated on some occasions, but her diabetes has been reported as controlled and endocrinology exams have been normal. So, yes, there is, indeed, a credibility issue here.

### 1.

Ms. Sepeda begins her attack on the ALJ's credibility determination by submitting that the ALJ employed meaningless boilerplate and that, as a result, a remand is required. (Dkt. #27, at 6-7). In assessing her credibility, the ALJ did trot out the now tired boilerplate that the Seventh Circuit has criticized time and again – with no effect on the ALJs in this district: "the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms

are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 26). This is cart-before-the-horse logic – or illogic – and is anathema to the Seventh Circuit; a red flag to a bull. *Moore v. Colvin.* 743 F.3d 1118, 1122 (7th Cir. 2014)("We have repeatedly condemned the use of that boilerplate language because it fails to link the conclusory statements made with objective evidence in the record."); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir.2012)("It puts the cart before the horse, in the sense that the determination of capacity must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion."); *Bjornson v. Astrue*, 671 F.3d 640, 644–46 (7th Cir.2012)("The Social Security Administration had better take a close look at the utility and intelligibility of its 'templates.'"); *Parker v. Astrue*, 597 F.3d 920, 922 (C.A.7 (Wis.),2010)("It is not only boilerplate; it is meaningless boilerplate."). But, still, despite warning after warning and plea after plea from the Court, the phrasing continues to appear in ALJ's decisions.[2]

Still, the boilerplate is not, without more, reversible error since almost invariably the ALJ will follow up the offending phrasing with reasons for finding the claimant not credible. When, as here, they do so, the boilerplate is not a problem. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013); *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir.2013); *Filus*, 694 F.3d at 868. Beyond ignoring the ALJs explication of the reasons for finding the plaintiff not credible, the plaintiff's brief goes on to concede that the ALJ followed up with reasons for disbelieving Ms. Sepeda in the paragraph after his boilerplate argument. The

---

[2] It is difficult to account for this seeming perversity. It is equally difficult to account for the insistence by Social Security claimants that the inclusion of the boilerplate is a basis for reversal when the Court of Appeals has said over and over it is not, so long as there is an adequate explanation in other parts of the opinion.

argument then is pointless and endangers possibly sound arguments. *See Walker v, Abbott Laboratories,* 416 F.3d 641, 643 (7th Cir. 2005)(decrying the tendency of some lawyers to pile on arguments); *Rehman v. Gonzales*, 441 F.3d 506, 508-09 (7th Cir. 2006)(noting the tendency of flabby arguments to displace more focused ones); *United States v. Brocksmith*, 991 F.2d 1363, 1366 (7th Cir. 1993)("A client is disserved when the most meritorious arguments are drowned in a sea of words."); Matthew Kennelly, *Over-Arguing Your Case*, 40 LITIGATION 41 (Winter 2014).

Ms. Sepeda argues that the reasons the ALJ provided are inadequate to support an adverse credibility finding. The ALJ is "in the best position to determine a witness's truthfulness and forthrightness" and a reviewing court "will not overturn [the] ALJ's credibility determination unless it is 'patently wrong.'" *Skarbek v. Barnhart*, 390 F.3d 500, 504–05 (7th Cir.2004). *See also Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013); *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir.2013); *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012). On review, the court "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir.2008); *Schreiber v. Colvin*, 519 Fed.Appx. 951, 960 (7th Cir. 2013). If the ALJ provides adequate rationale for his credibility determination, it must stand. *Pepper*, 712 F.3d 351, 367 (7th Cir. 2013); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir.2009).

Here, the ALJ based his adverse credibility finding on his observations of Ms. Sepeda at the hearing, the objective medical evidence, and inconsistencies in Ms. Sepeda's statements. These are all valid reasons for disbelieving a claimant's testimony. *See Olsen v. Colvin*, 551 Fed.Appx. 868, 876 (7th Cir. 2014)(ALJ's observations of claimant and medical evidence); *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013)(minor discrepancy in testimony and ALJ's observations of claimant); *Lott v. Colvin*, 541 Fed.Appx. 702, 707 (7th Cir. 2013)(inconsistencies in testimony); *Pepper v. Colvin*,

712 F.3d 351, 368-69 (7th Cir. 2013)(medical evidence); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir.2005) ("[A] discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration."); *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011)(medical evidence); *Carter v. Colvin*, – F.3d –, –, 2014 WL 2186594, 3 (7th Cir. 2014)(claimant's demeanor at the hearing); *Oakes v. Astrue*, – F.3d –, –. 258 Fed.Appx. 38, 43 (7th Cir. 2007)("But this court has repeatedly endorsed the role of observation when determining credibility."); *Olsen v. Colvin*, 551 Fed.Appx. 868, 876 (7th Cir. 2014)(ALJ's observations at the hearing).

But Ms. Sepeda nit-picks the ALJ's credibility assessment rather than give it a commonsensical reading as the reviewing court is bound to do. *Schreiber v. Colvin*, 519 Fed.Appx. 951, 960 (7th Cir. 2013); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir.2010); *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Ms Sepeda begins by complaining that the ALJ failed to acknowledge that she undertook physical therapy after her 2008 surgery, and instead indicated that her failure to do so undermined her complaints. (Dkt. #27, at 8). That's just wrong and misreads the ALJ's opinion. The ALJ actually said "[a]fter surgery the claimant underwent physical therapy starting in July 2008 for seven sessions, and speech therapy for vocal cord paralysis after surgery" (R. 25), and "[t]he medical record does support that the claimant had some pain after her surgery. This is shown by her visits to the pain specialist with steroid injections, her seeking physical therapy and taking Neurotonin." (R. 27).

Ms. Sepeda commits a similar error by arguing that the ALJ wrongfully disbelieved that she had difficulty concentrating because she could read the Bible daily – she in fact said she read just twice a week. (Dkt. # 27, at 8). Once again, she misreads the ALJ's opinion. While the ALJ did

overstate her reading habits, he did not, as Ms. Sepeda contends, use it against her. Instead, he said he was *accepting* her subjective complaints of concentration problems due to pain and made them a part of her residual functional capacity. (R. 26). As a result, he found her limited to simple, routine, and repetitive tasks. (R. 26).

Ms. Sepeda then chastises the ALJ for calling her on her exaggeration of her pain level at the hearing. The ALJ asked Ms. Sepeda to rate her usual back pain level with 10 being so severe that she had to go to the emergency room. More than once she insisted her usual pain level was a 10, even though she had to concede she had never gone to the emergency room for it – there are no records of emergency room treatment, after all. (R. 53-54). She explained that she didn't go to the emergency room because she went to doctors instead. She then switched positions, saying maybe it was because she didn't have a ride – although she had a ride to her doctor. When the ALJ provided her with an example of a trip to her doctor when her pain was a 5, she said that couldn't be because her pain was a 10. It did not matter to Ms. Sepeda that her treating physician reported her as saying it was merely a 5. It's not clear whether Ms. Sepeda thought her doctor was lying or the ALJ was lying, but the doctor's report certainly undermines her credibility. (R. 59, 454). And the ALJ would have been derelict in his duties to have ignored the inconsistencies.

One could characterize this line of testimony as exaggeration or lying, but Ms. Sepeda accuses the ALJ of trying to trick her. It's not clear how. The ALJ was clear in his definition of the 1 to 10 scale, and Ms. Sepeda had several chances to rate her pain a 9 or an 8 or a 7 or a 6. She refused. That's not a trick on the ALJ's part, that's obstinance in the face of the evidence on Ms. Sepeda's part. She even goes so far in her brief as to say it's a "rather common practice of claimants who have experience of intense and chronic pain to rate their pain as a 10/10 despite whether you

"define" that level as being "emergency-room" level of intensity. (Dkt. # 27, at 9). Since "[n]othing is simpler than to make an unsubstantiated allegation," *Parko v. Shell Oil,* 739 F.3d 1083, 1086 (7th Cir. 2014), a lawyer's unsupported statements in briefs don't count. *United States v. Adriatico-Fernandez,* 498 Fed.Appx. 596, 599-600 (7th Cir. 2012)(collecting cases).

In any event, even if it is a rather common practice, it's still exaggeration or lying, and an ALJ is not bound to accept it uncritically. "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir. 2006); *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir. 2004)(unscrupulous applicants might exaggerate their pain).

Along a similar vein, Ms. Sepeda has a problem with the ALJ noting that, despite the fact that she testified that she can sit for no more than 30 minutes before she is in such excruciating pain that has to lie down, she was able to sit for longer at the hearing (nearly an hour)– and before the hearing – without any request for a break or to change positions and her demeanor gave no evidence of discomfort. (Dkt. #27, at 8; R. 26). As already noted, the Seventh Circuit has repeatedly endorsed the role of the ALJ's observation of the claimant in the credibility assessment. *See Oakes v. Astrue*, 258 Fed.Appx. 38, 43 (7th Cir. 2007); *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir. 2004); *Wheeler v. Barnhart,* 177 Fed.Appx. 478, 482 (7th Cir. 2006); *Buchholtz v. Barnhart,* 98 Fed.Appx. 540, 546 (7th Cir. 2004).

Moreover, this is not an example of what the court once criticized as the "sit and squirm" test. *See Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000). The ALJ did not say, "well, she claims to be in pain but she doesn't look uncomfortable to me." No, here was a claimant who was rather

strident about her limitations. She could sit for *no more than* 30 minutes. Her pain was *no less that* a 10. It would be ridiculous to say that an ALJ cannot disbelieve a claimant who says she is incapable of lifting anything when the ALJ observes that claimant lifting bottles of water to drink from throughout a hearing. *See Olsen v. Colvin*, 591 Fed.Appx. 868, 876 (7th Cir. 2014). The court is not a rubber stamp for the ALJ, but neither is the ALJ a rubber stamp for the claimant. Ms. Sepeda was clearly exaggerating, if not outright lying, throughout her testimony. The ALJ was correct in finding her not credible.

Next, Ms. Sepeda criticizes the ALJ for looking to the medical evidence and finding it failed to support the extent of her complaints (Dkt. #27, at 9). She cherry-picks four reports she claims do support her allegations, but ignores the many that don't, such as the normal EMG, lumbar MRI showing improvement, essentially normal thoracic MRI, essentially normal – aside from evidence of surgery – cervical MRI, a number of normal musculoskeletal exams, or exams showing limited restrictions in motion, and the list goes on. Remember, the ALJ did not say that the medical evidence showed that Ms. Sepeda had no pain or limitations. All he said was that the medical evidence did not support the degree of limitations and pain Ms. Sepeda alleged. And it certainly does not support unrelenting, emergency-room level pain requiring her to lie down for the better part of every day.

Ms. Sepeda has one last nit to pick. She complains that the ALJ asserted, without explanation, that she was reluctant to try other medications. (Dkt. #27, at 9). What the ALJ did was question Ms. Sepeda's testimony that she continued to take Neurotonin religiously even though it did reduce her pain at all. Apparently all it did was make her drowsy so she could get some sleep when she took it at night. (R. 27). Ms. Sepeda seems to suggest that she didn't say that – she did,

of course (R. 53) – and said the ALJ ought to have explained what he meant. (Dkt. # 27, at 9). It's not clear what more explanation Ms. Sepeda requires. If someone says their pain is a 10 with Neurotonin and a 10 without it, why take it at all? It's far more likely that the Neurotonin does reduce Ms. Sepeda's pain to some degree and she is, again, exaggerating. To be sure, there is a logical bridge requirement in the Seventh Circuit, but there is no requirement that one be escorted across the bridge as well. *See Elder*, 529 F.3d at 415; *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir.2008); *Rice v. Barnhart*, 384 F.3d 363, 372 (7th Cir.2004).

**2.**

Ms. Sepeda's final problem with the ALJ's decision is that he did not explain his RFC determination adequately enough for her. She says he "described some, but not all, of the medical evidence in detail." (Dkt. # 27, at 11). The ALJ didn't have to describe all the evidence in detail. The Seventh Circuit has repeatedly held that an ALJ does not need to discuss every piece of evidence in the record; he simply cannot focus only the evidence supporting his ultimate conclusion while ignoring the evidence that undermines it. *Moore*, 743 F.3d at 1123; *Sawyer v. Colvin*, 512 Fed.Appx. 603, 608 (7th Cir. 2013); *McFadden v. Astrue*, 465 Fed.Appx. 557, 559 (7th Cir. 2012). The ALJ did not ignore contrary evidence here. He noted the results of studies showing some spinal degeneration and mild abnormalities. It is not clear what more Ms. Sepeda wants from the ALJ. Especially given the ALJ's rather thorough and well-reasoned decision, it is incumbent upon Ms. Sepeda to point out what evidence there is that the ALJ missed that would have proven her case. *McFadden*, 465 Fed.Appx. at 559 (claimant had to point to overlooked evidence that proved

disability).[3]

There is just one piece of evidence Ms. Sepeda says that the ALJ ignored altogether – Dr. Rinella's report of March 15, 2010. Ms. Sepeda asserts that the report shows she cannot walk – she walks with a cane – has 8/10 cervical pain and a positive Hoffman's sign. (Dkt. #27, at 12). The ALJ did not ignore Dr. Rinella's report. (R. 25). Moreover, the report says *she* rated her pain as an 8, not that the doctor did, and we know now that Ms. Sepeda tends to exaggerate. Dr. Rinella did note one single reflex abnormality with the positive Hoffman's sign, but also noted essentially normal MRIs of the lumbar, thoracic, and cervical spines – with the exception of surgical hardware present in the cervical study. While he noted that Ms. Sepeda walked with a cane at the exam, he told her she should be active and ambulate as much as possible. (R. 505). And, it must be remembered, that this was in the wake of a number of examinations where it was noted her gait and lower extremity strength and motion were absolutely normal.

Beyond that, the evidence Ms. Sepeda cites is all evidence the ALJ discussed. (Dkt. #27, at 11). The bulk of it – some abnormal cervical spine studies – are from prior to Ms. Sepeda's surgery. As the ALJ explicitly discussed and as the objective medical evidence showed, Ms. Sepeda improved following surgery. The one study following surgery showed only possible *mild* abutment of the

---

[3] Ms. Sepeda adds that the ALJ ignored her vocal cord paralysis, asthma, cervix abnormality, and diabetes mellitus. (Dkt. # 27, at 12). He certainly did not ignore her diabetes, discussing it in detail and noting that endocrinology exams generally showed it was asymptomatic or under control. (R. 25, 27). As for her vocal cord problems, cervix abnormality and asthma, there is no evidence that any of these things have any affect on her ability to work. Ms. Sepeda certainly is unable to point to any. *Cf. Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir.2004)(claimant complaining that ALJ ignored obesity must explain how it hampers her ability to work). For example, the asthma evidence she cites references an exacerbation of her asthma that subsided to post-nasal drip on March of 2006. (Dkt. # 27, at 12 (citing R. 255, 257). Ms. Sepeda does not explain how the post-nasal drip she suffered in 2006 – when she was working – disables her. The argument is another example of the nit-picking that, really, tends to undermine any semblance of a valid argument Ms. Sepeda might have in support of her claim.

spinal cord and *mild* changes. Dr. Rinella, orthopaedic surgeon, did not even deemed these changes noteworthy in his review of the study. (R. 505).

At times, Ms. Sepeda's brief – never sublime – verges on the ridiculous. She complains that the ALJ failed to explain what import a negative MRI has. (Dkt. #27, at 11). A negative MRI shows *nothing*, it is *negative* for any abnormalities. It undermines – as the ALJ stated – allegations that one is so debilitated that she must lie down nearly all of the day. Again, an ALJ does not have build a bridge and then carry the reader over it on his back.

Finally, Ms. Sepeda says that the ALJ had to have a medical expert at her hearing because the ALJ was unqualified to determine that the mild abnormalities shown throughout the objective medical record translated to no more extensive limitations than light or sedentary work. But, the evidence was adequate to allow the ALJ to make a determination, and he is not required to call on a medical expert. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Moreover, Ms. Sepeda ignores the fact that the ALJ did not pull his RFC determination out of thin air. He relied on the opinions of two disability agency physicians who reviewed the medical evidence. Those opinions constitute substantial evidence to support the ALJ's RFC determination. *See Murphy v. Astrue*, 454 Fed.Appx. 514, 519 (7th Cir. 2012); *Fleming v. Astrue*, 448 Fed.Appx. 631, 634 (7th Cir. 2011); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).[4]

_____

[4] In her reply brief, Ms. Sepeda contends that the ALJ could not rely on the state agency physicians because he failed to give controlling weight to her treating physician. (Dkt. # 44, at 3). But there is no opinion from Ms. Sepeda's treating physician that she is disabled. Ms. Sepeda also insinuates that the ALJ had to specifically address each of the factors listed in 20 CFR 404.1527 in his discussion of the state agency physician's opinions. That's simply not true. The Seventh Circuit has said, over and over, that an ALJ need not detail every reason for the weight he accords a medical opinion. He need only minimally articulate his reasoning to a degree that allows the reviewing court to follow it. *Wurst v. Colvin*, 520 Fed.Appx. 485, 488 (7th Cir. 2013); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir.2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir.2008).

**3.**

As suggested at the beginning of this discussion and demonstrated throughout, Ms. Sepeda was not a credible claimant. She either lied or exaggerated during her hearing, at times rather stridently. In her brief, she sought to attack the ALJ's adverse credibility determination by, among other things, mischaracterizing or misreading his opinion, ignoring the bulk of medical evidence that supports the ALJ's determination, and ignoring the logic of certain of the ALJ's observations. If that is what it takes to put together an appeal of an ALJ's adverse disability determination, perhaps that is an appeal that should not be advanced. *See Hill v. Norfolk and Western Ry. Co.*, 814 F.2d 1192, 1202 (7th Cir. 1987)("The filing of an appeal should never be a conditioned reflex. 'About half the practice of a decent lawyer consists in telling would-be clients that they are damned fools and should stop.'")(quoting 1 Jessup, Elihu Root 133 (1938)).

## CONCLUSION

The plaintiff's motion for summary judgment or remand [Dkt. #26] is DENIED, and the Commissioner's decision is AFFIRMED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 8/18/14